The United States Court of Appeals for the 10th Circuit is now in session. All those having business before this honorable court may now come here and they will be heard. Proceed to the United States of this honorable court. Please be seated. Welcome. We'll have three cases for argument today. We'll begin with case number 231123, Fuel Automation v. Energera. Counsel. Good morning, your honors. May it please the court. First, I'd like to introduce Jeff Parks, my co-counsel with me at counsel's table. And I'd also like to reserve five minutes for rebuttal if that's possible. So you're the master of your own time. Watch the clock and we'll try to let you go in time to have some rebuttal. Understood. Thank you, Jeff. Your honors, no one in this case, including the district court, ever found a prior case holding a party in breach of a covenant not to sue,  the district court instead wrongly transformed a personal right, a contract covenant, into a product right of effectively a license running all the way through to the end of the stream of commerce. That was a first legal error because the contract here deliberately held back and carved out license rights. This was the no license hold back in section 13 that the district court should have applied but did not. Then on top of this, the district court committed a second legal error. It found ambiguity where there was none. And this was the foreign patents clause. The court let FAS argue to the jury a meaning that was backwards, backwards of what the clause actually says. There is no dispute that the Canadian 567 patent is not one related through priority. It is not one that priority claims to certain U.S. patents, but the opposite. It is one they claim priority from. I'd like to start with the proper parties issue. The district court misapplied the federal circuit's transcourt ruling to blur the party scope issue in two ways. First, on its own terms, transcourt was not a contract case. It was not a case between settlement agreement parties, but it was a patent exhaustion affirmative defense case. So in what way did the district court here, in your view, rely on patent exhaustion? Because I'll tell you how I see part of this, of your argument, and let me know what I've gotten right or wrong. It seems to me that your argument on the party scope issue turns on the otherwise engaged language. Is that fair? That's included in the language on which the argument turns, but I'll take that, yes. So I guess I'm having trouble seeing where in the district court you advanced an argument on that language, because that seems to me to be the dispositive part of the district court's holding, and the district court's consideration of patent exhaustion was sort of more to inform its general understanding, but it seems that the reading of the contract turned on those words, and I didn't see how you argued that in the district court. Yeah, that's a great question, because what happened in the district court was, we're talking about now the first summary judgment ruling, that was a grant of summary judgment. The district court, at page 1708 in the appendix, the footnote 11, it pointed out how strange it was that it was FAS, the move ant, who had never raised the otherwise engaged language. So the context of the case at the time of summary judgment was, FAS's briefing had not triggered any analysis, run any analysis of the otherwise engaged language, and so it's in that context that we now come to this court accused of some kind of forfeiture or waiver. In fact, it was FAS who had not raised that language, so there was no occasion in the summary judgment response for my side, which I think at the time was Frack Shack, now Energera. There was no occasion for us to really go into that in any detail. However, if you do read our summary judgment papers, the opposition was at 1609 to 26. You'll see that we were fulsomely arguing the plain language of the Section 2 covenant, and fulsomely arguing that it just does not cover this scenario of suing a stranger to the contract. And hopefully, if that answers your question, Your Honor, I'll move to the next issue. I think it does, just to confirm. So I'm right in not seeing any affirmative argument from you on the otherwise engaged language, but your position is that that doesn't constitute any sort of forfeiture because it was encompassed in the general, more holistic argument that you were making about the construction of the clause. Everything you said is fair, Your Honor. I agree with that. And one final point on your point, Judge Rossman, is page 2361 of the appendix footnote 14 is the second summary judgment opinion. And there, the court chided Energera for trying to re-raise the Section 2 coverage question at a later point in the litigation. So it wasn't as if the otherwise engaged analysis entered the court's thinking at the summary judgment phase, and now it's open season. We can now start talking about it. The district court shut that down. So now here we are on appeal, and we're analyzing, we're running through the analysis that the district court did. So there really can't be any fair argument for a forfeiture or a waiver. So back to TransCorp, I mentioned it was a contract case between settlement agreement parties. It was not that, rather. It was a patent exhaustion affirmative defense case urged by a stranger to the contract. And even if TransCorp somehow applies, that supports Energera, because the present case's conditional covenant not to sue conveys no rights to customers. And so first, the first thread that I just mentioned, I want to go into how patent exhaustion has no role in contract interpretation. We cited the Google case, which says just that. And here, the plain language in section two, it left out customers. Left out customers from the covenant not to sue. That is undisputed, and it leaps off the page. It's just plain language. Contrast this with section eight, which names customers. Doesn't it make the whole contract sort of illusory, though, if you take customers out of the mix? Because you basically said they could sell the product, but you could go around the back door, sue all their customers so no one would do business with them, and you just take away the benefit of the bargain. If Your Honor's thinking in that direction, that doesn't take into account the context of the prior litigation and the context of the settlement. Now, this has a risk of going into extrinsic evidence. But at the time, there was no customer situation. FAS and Atlas were not purveying their wares to any customers. They were performing services and doing it amongst themselves. There might have been some intra-company transactions. So the rights that they bargained for, and again, extrinsic evidence, they drafted this term. The rights that they bargained for were rights that perfectly suited the kinds of things they had been accused of infringement for. There just wasn't a context where it was evident from an objective observer that there was a need for customer rights. What about the press release? The press release is interesting. I think that's a red herring in every different way. The press release simply almost paraphrases Section 2, but it doesn't expand Section 2. So it doesn't say customers anywhere in the press release. So if that addresses your question. Let me ask you another question. I want to ask you about the priority claim discussion in your brief. As I understand it, I don't claim to be an expert in the field, but a priority claim is a way to link a later filed patent application to an earlier filed patent application, right? That's correct. OK. If you have the words related through, how does that not indicate that as long as there's some relation between the patents, that it can flow either way? The answer is because it's not a willy nilly relation. So the word through is a preposition. It's a preposition of manner. We read related through priority claims to as a modification of related by naming the specific kind of relationship. The specific kind of relationship is ultra-precise in this verbiage. Would your position be different if the word was related to? That would be a very different case, Your Honor. In fact, I think page 16 of FAS's brief on that point, Your Honor, it goes a long way to explaining why we've continued to see what we think is an unreasonable interpretation from FAS. Because this is their brief in this court. They say that the only preposition attached to the word related is the preposition to. I hope Your Honor's caught that. That is wrong. Because the word through, as I just mentioned, it's a preposition. And it explains how the foreign patents are supposed to be related. And the answer is through priority claims to particular patents. So in the manner of such priority claims. This is the basic grammar mistake by FAS. And it's had consequences throughout this case, forcing a jury trial. But this court can correct that through reversal. Let me ask you a couple more questions. So your position is that the district court erred in making a finding of ambiguity, right? On the foreign patents issue, correct. And your position also, it depends on it being unambiguous. I mean, so you say there are a couple of canons of construction that require us to adopt your position. But at the same time, there's no ambiguity. And where I'm going with this is, as I understand it, typically, to employ the canons of contract construction, you have to first have an ambiguity. Do you agree with that? I don't agree or disagree. I'm unfamiliar with that as a proposition. But really, I mean, our main argument is plain language, English grammar. And we brought up these canons as sort of corroborative to show that we're not just. Yeah, but I mean, you did raise the last antecedent rule. And I think what Judge Carson's asking is, do we even need to employ that rule when, or as the Supreme Court has said, you maybe only do it if there's not contrary intention when you look at the language itself. Does that even apply here at all? Well, I agree. The exceptions are very permissive. I think the Colorado Supreme Court says any evidence of intent that counters the last antecedent canon should be given some effect. But we don't need to rely on the last antecedent canon. We really don't. So I just want to warn you, you wanted some rebuttal. That's exactly right. So we would simply ask your honors on both of these two issues on appeal. We would ask that this court, as a matter of law, reverse and remand for rendering of judgment.  Thank you. May it please the court. Stephen Susser with Evia Law, PLC. Joined with me at the council table is Biana Hamadi and John Orliva, in-house counsel for my client, Fuel Automation Station. This appeal stems from a settlement agreement in which Fuel Automation Station paid $5.25 million in exchange for a covenant not to sue. That covenant not to sue applied to all frack shack rights as defined. Those included specifically foreign patents related through priority claims to the US patents that were at issue in the underlying patent infringement lawsuit, including the original patent, which was a Canadian patent that ended in the letters of the numbers 567. Counsel, may I ask, is the 567 the only foreign patent that was part of this patent family, or is it the only one that's discussed in this appeal because it's relevant? It's sort of what triggered all this litigation. The latter. There's also an Australian patent as well. But the 567 is sort of key because it's the original patent from which basically the parent of the family from which all the other patents stem. So tell me this, would the Australian patent be related through priority claims as your opponent defines it, or was it a prior patent? It was, I don't remember offhand if it was prior or not. But it would only, according to them, it would only apply if it were before the 662, before the US patents. And so the 567 patent was after? The 567 patent was the first, actually. Yeah, the 567 Canadian, I realize it's confusing with the letters, but the 567 patent was the Canadian one. Really, the 662 and the 906, I tend to refer to them together as a 662, was the US patent about which we were fighting in the underlying lawsuit. And the language that was chosen, related through priority claims, was chosen specifically to encompass anything, named or not named, that was part of the same patent family, a family that began with the 567 and continued on through some of the US patents that have been mentioned. Counsel, could you speak to the district court's conclusion on ambiguity here, or really to your opposing counsel's argument that the district court's ambiguity conclusion here, that there's something about the reading that you're offering that contravenes patent law, that you can't read priority claims to the way that you insist because that's inconsistent with the technical understanding of that term in patent law? Gladly, Your Honor. What Energera is trying to do is to take the words, priority claims to, out of context and turn them into a technical word that's just used in the art. That's not the case. If they refer to the phrase, claims priority to, the verb, claims priority to, that is a commonly used phrase we would acknowledge. And indeed here, if the language said it covers any patent that claims priority to the 662 patent, then we would be in a very different position. It would be similar to what Energera wants. But that's not the reality. The reality is that when you claim priority, typically you go to the first patent in the family because you want the earliest date. Priority is really basically cutting the line in a way. Having a friend save your place in line while you park the car and you go and you jump to that place because it's your friend. You're related or connected. Typically, you'd want to go back to the first patent in time so that you could capture in that patent any products or services that infringe after that date, even if the product was out in the market before you patented the continuation. But that allows you almost artificially to jump backwards in time to that first priority date. And so you refer to any patent that is connected to that original patent by having basically the same disclosure and similar claims as part of a family of patents. And what we wanted to capture with the related to language is just that, the family of patents. And while I would never say I'm related only to my mother but not to my son, it's multidirectional. As Judge Carson said, it really goes both ways and was intended to go both ways. And the counsel of the language isn't related to, it's related through. We sort of keep quibbling over these words. But can I go back actually to something you said a moment ago? You said Intergera is trying to apply technical meaning to the priority claims too. Doesn't Colorado law say that technical words are to be given their technical meaning within contracts? Yes. So if that's true, then if we give it a more technical reading, as I think you're saying Intergera suggests, does that diminish your argument at all as to how we can interpret these five words? Well, the five words don't have, I would suggest, Judge Federico, that the five words do not have a technical meaning. They're trying to create a technical meaning out of three words they're choosing priority claims to. There is no technical meaning to priority claims to. I mean, I did a search yesterday of all US Supreme Court and Federal Circuit cases that use the phrase priority claim to or priority claims to and patent, and I got eight decisions. When I typed in the same search but changed it to claims priority to, there was 198. So claims priority to is indeed used commonly in, I guess you could call it a technical term. Priority claims to is not. Here the verb is related, and it's not related through. It's related to with a prepositional phrase in the middle through priority claims. I'm related to my, I'm related to John. How am I related? Through blood. Related through blood to John, as opposed to other relations. So it just describes the nature of the relationship. But in no way is it unidirectional, as Intergera wishes to say it is. Do you think that their reading is plausible? No, I do not. So do you agree with them that the district court's conclusion that the term was ambiguous was incorrect? I think I lost the syntax a little bit, Judge Carson. Did you argue for ambiguity before the district court? No, personally I don't think it's ambiguous. I think the only reasonable interpretation is ours. However, standing here today, I believe that all this court needs to find is that our interpretation is reasonable, not that it's correct, and not that their interpretation is wrong, just that ours is reasonable. I think we carry the day on that issue. And that's because you have a jury verdict in your favor? Correct. So if the judge, if it was at least reasonable, then it was ambiguous. The judge was right to find it was ambiguous. And then the jury followed up with its conclusion. If I could turn for a moment to exhaustion, and I want to harken back to Judge Rostin's question in this, because I do believe that exhaustion was critical to Judge Verhollich's summary judgment decision. The concept of exhaustion basically says if you have an authorized sale, you give up all of your, or exhaust, all of your rights to allege patent infringement through that sale. So if I buy a Ford car, Ford cannot come after me and say, well, you're infringing a patent on the radio, and on the tires, and on the engine. And that also applies downstream. So it means that if I were to take it to a mechanic, the car to a mechanic, Ford cannot sue the mechanic for working on the car, working on the patented engine, because that right was exhausted. The right to exclude was exhausted through the first authorized sale. And it's why I can sell the car to my son, and my son is immunized, if you will, from patent infringement allegations. It's a concept that goes back to at least the 1800s. And the Supreme Court has repeatedly stated that, that the first authorized sale basically ends your right under patent infringement. You can sue for breach of contract, or tort, or anything else that's applicable, but just not patent infringement after the first authorized sale. Here, there was a first authorized sale. And we agree, of course, with Judge Verhollich's finding that there was an authorized sale. That authorized sale would be any sale from Fuel Automation Station, or FAS, to any of its customers, whether sale or lease, by the way, because they've been treated as equivalent. The reason why you can get a first authorized sale from, in this case, Fuel Automation Station, as opposed to the patent holder, Energera, is because Energera gave to us, Fuel Automation Station, a covenant not to sue. That covenant not to sue puts us effectively in the position of a patent owner when it comes to exhaustion and the right to sell with authority. So here's where I'm stuck. It seems that patent exhaustion bears on the declaratory judgment action, doesn't it, in terms of the declaratory relief that authorizes your sales, that that is not contested in this case? That the, I'm not sure I fully understand your question. I apologize. No, it's my misstatement. Is it, so the settlement agreement, it's uncontested, authorizes FAS's sales, correct? That's our position, yes. And that's something that Judge Verhollich determined? Yes. In the declaratory judgment context, right? Yes, Your Honor. And my question is, it seems that the patent exhaustion concept relates to that. Am I misunderstanding? I believe what the judge was saying is it relates to our right, FAS's right, to sell or lease and bestow on the person to whom we sell or lease an immunization from patent infringement through the doctrine of exhaustion, as if we were Energera granting that same right to somebody. So because the covenant not to sue, according to the trans court case, gives that right, that authorization, if it's not restricted. And ours is not restricted. It doesn't say you can make or use, but you can't sell, for example. It's unrestricted. And the press release supports that. And I think Judge Verhollich used the press release and indeed otherwise engage to support this issue that we, FAS, were not in any way encumbered in the covenant not to sue. And because we were unencumbered, that covenant not to sue places us in the same position as Energera when granting the right to be free from patent infringement threats. Counsel, can I ask, if the patent exhaustion doctrine just applies as a matter of law, so it doesn't even need to be referenced in this contract, then what's the purpose of the licensing language? The covenant not to sue certainly, in this case, Your Honor, it was a covenant not to sue. The trans court case did say that a license and a covenant not to sue for purposes of exhaustion are equivalent. So it could be either. But in our case, the covenant not to sue is very important because if it had been restricted, if it said you could make or use but not sell, then we would not be in a position to make an authorized sale or lease. So we would not be able to bestow exhaustion to our downstream customers. But because the covenant not to sue was not restricted in any way, and if it had been a license, it wouldn't have been restricted in any way. It would be the same thing. But because it was not restricted in any way, that now gives us the authority to trigger the exhaustion doctrine and basically say, you're free downstream from suit for patent infringement. But again, if that's true, if we look at every, all the four corners of this agreement, then again, what is the purpose of the no license language? I mean, Intergerra gives it a specific purpose here. But what purpose would you give it? I'm sorry, I think I misunderstood your earlier question. I apologize. So the fact that the agreement says no license, which by the way, the trans court case also said no license, although I think they're disputing, they said that's the context of a release and it's different from a covenant not to sue. The trans court case, by the way, was a settlement agreement, just like ours. So it's similar in that sense. But I want to explain that a license is not the same thing as a covenant not to sue. We're not saying they're exactly the same. For example, an exclusive license gives you rights that you can't get with a covenant not to sue, which is not exclusive. A license in the trademark context requires the transfer of goodwill. There are things that a license does that the covenant not to sue does not do. However, the federal circuit made quite clear in the trans court case, when it comes to exhaustion, the doctrine of exhaustion, they're treated as equivalent because both give up the right to exclude. And that right to exclude is really what a patent gives you. It's not the right to make, use, or sell. It's the right to exclude others from making, and using, and selling. And a covenant not to sue gives that up, and therefore transfers the right that comes with the first authorized sale in the exhaustion context. I have one more question. Go ahead. I wanted to get your position on the otherwise engaged language, both your position on the construction of that language, but more specifically on what we're to do with how the district court interpreted it, and the views of your opposing counsel on that issue. I see, Your Honor, the otherwise engaged language and the press release in the district court judge's opinion, the magistrate judge's opinion, as being support for his finding of the authorized sale. So support for the exhaustion doctrine application. He was basically saying, as I read it and understood it, that the exhaustion certainly gives the right to protect your customers. But in addition, there are other telltale signs in the settlement agreement taken as a whole that indicate that that's what the parties anticipated and thought was right. For example, you wouldn't be otherwise engaged. So you wouldn't be in this position where your customer was sued, and you're seeking indemnification from us, from FAS, as an example. The press release puts no restriction on making, using, or selling. So the fact that the press release says you're not restricted in selling is further support that there was an unrestricted, unencumbered covenant not to sue in the agreement itself. And you don't think that the otherwise engaged language is ambiguous, or renders the covenant ambiguous? Oh, I do not, no. Because the covenant not to sue is, in fact, I would almost argue that the otherwise engaged, if anything, bolsters the covenant not to sue language, and just makes clear, unlike TransCore, and I think that's what the judge said, this is even a broader grant of rights than TransCore, because TransCore did not have the otherwise engaged language, but we did. It further emphasizes what the parties were trying to accomplish as the judge read that settlement agreement. OK, thank you, counsel. Thank you. Let's go ahead and add three minutes on to the rebuttal here. And now that you're up, I'm going to use part of your three minutes. We had some discussion earlier about the timing of these various foreign patents. And I guess my question is, if we use your construction, how many patents actually fit within your definition of the foreign patents? Does the Australian patent fit? There's an ambiguity, I'm sorry, in your question. I'll answer both ways. Under our interpretation of the contract, the Canadian patent and the Australian patent are excluded from coverage of any grant of rights. OK, are there any other patents, any other foreign patents? Under our interpretation of the contract, there do not exist any foreign patents that would be covered by the foreign patents clause. OK, then what would be the purpose of the language any foreign patent related through priority claims if there are none? Right, in our reply brief, we go into this. It's something like a comfort and insurance clause. It's just in case we're all wrong, our records were messed up. It's something to give comfort to the parties that there is some categorical extra scope. It may never get invoked on the facts on the reality of the world. But as just a plain language read through of the contract, it does categorically give extra scope to the rights. Or it could suggest that your opponent's construction is plausible, right? Not on plain language, Your Honor. I can't go there. Well, you're reading that out. Well, to structure the thing that Your Honor just ran through just in a different way, Your Honor is saying, well, if the real world didn't have any foreign patents that would trigger under Energera's construction, maybe that renders the term ambiguous. But we don't look to what's going on in the real world to answer the initial legal, pure legal question of whether a contract term is ambiguous. Yeah, but these are your patents though, right? I mean, so if there were foreign patents that related to, related through, whatever the term is, you would have known about them at the time. That's correct. So the idea that it's in there because it's a belt and suspenders kind of position doesn't make a lot of sense if you're in possession of the knowledge that there aren't. And that argument works in the other direction too, which is there was a whole exhibit with named patents. Why didn't, when they drafted the clause, why didn't they simply put the exhibited patents in the rights clause? But they didn't. Instead, they used the framing. Because presumably, you're the one who knows what foreign patents you have. I understand. The point, Your Honor, my last response to this is. I won't take up anymore of your time. Yeah, the anti-surplusage canon, which is kind of what you and I have been bantering about, doesn't exist to create an ambiguity in a contract that's not already there or that's not otherwise there. You can't use it to create an ambiguity. You can use it to resolve one, but not create one. So the rebuttal points I'd like to walk up here and talk about. Judge Rossman, you asked Mr. Susser about the otherwise engaged language. I just want to remind the court that the language isn't just otherwise engaged, two words. It's much longer than that. It's in a judicial or administrative proceeding. So to my eye, it does expand a little bit beyond just a plain vanilla lawsuit from Intergera against FAS. But the expansion is engagement in a proceeding, which to my eye seems of the nature of it prevents joinders, it prevents subpoenas, it prevents garnishments, things that would lock in a court or administrative agency's jurisdiction into a party. So we didn't do, Intergera, our side, didn't do anything that would fit this otherwise engaged, expanded scope, even in actions aggressive toward, let's say, KVA or letters to the industry. And Judge Federico, in response to your question to my friend, Mr. Susser waves the, quote, authorized sale concept around as, I think, as a talisman. But that's not how trans-court worked. That just begs the question. And the question is, are sales somehow restricted? Are they authorized but yet still somehow restricted a little or a lot? If Mr. Susser were right, why did the trans-court court run through the license holdback analysis? That's on page 1377 of trans-court. And just reading plain language from the decision, the inclusion of the language no express or implied license or future release whatsoever is granted to Mark IV or to any third party by this release refers only to the effect of the release provision. And thus, I emphasize the word thus, does not require a different result. Now, it's a bit of a negative pregnant legal argument for me to the panel. But had there been a no license holdback in trans-court that reached all the way to that covenant, this would have been a different case outcome in trans-court. That's how I read trans-court. Finally, on the question of foreign patent clause ambiguity at the outset, plain language, I just observe for your honors that Mr. Susser's argument unglues the word to, lifts it, moves it around in the clause, drops it, and reglues it next to the word related. To me, that's the sign of an unreasonable contract interpretation. Unless there are any further questions, we would simply ask the court to reverse and remand. Thank you, counsel. Thank you, your honors. The case will be submitted. Counselor, excused.